Roosevelt **LATHAN** and Pearline Lathan et al., Plaintiffs,

Citizens Against Freeways et al., Intervenor-Plaintiffs-Appellants,

v.

Claude S. **BRINEGAR**, Secretary of the United States Department of Transportation et al., Defendants-Appellees.

Roosevelt **LATHAN** and Pearline Lathan et al., Plaintiffs-Appellees,

v.

Claude S. **BRINEGAR**, Secretary of the United States Department of Transportation, et al., Defendants,

Washington State Highway Commission et al., Defendant-Appellants.

Nos. 72–2932, 72–2974.

United States Court of Appeals, Ninth Circuit.

Sept. 27, 1974.

Koelsch, Ely and Hufstedler, Circuit Judges, dissented in part and filed opinion.

Wallace, Circuit Judge, concurred generally and filed opinion.

Trask, Circuit Judge, concurred specially and filed opinion, in which Eugene A. Wright, Choy and Alfred T. Goodwin, Circuit Judges, concurred.

Chambers, Circuit Judge, concurred in result and filed opinion.

Roger M. Leed (argued), of Schroeter, Jackson, Goldmark Bender, P.S., Seattle, Wash., for appellants and cross-appellees.

Stephen F. Eilperin (argued), Civ. Div., U.S. Dept. of Justice, Washington, D.C., for appellees in 72–2932 and for appellants in 72–2974.

Thomas R. Garlington, Asst. Atty. Gen. (argued), Olympia, Wash., for appellants in 72–2974.

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

## OPINION

DUNIWAY, Circuit Judge:

We elected to hear these appeals, and the appeal in Keith v. California Highway Commission, 506 F.2d 696, which we also decide today, in banc, primarily to consider whether a new public hearing, under 28 U.S.C. § 128(a), must be held before further actions are taken to carry out the construction of two portions of interstate freeways.

The present case involves a new chapter in the continuing saga of Interstate Highway 90 (I-90) in the state of Washington,[1] specifically that portion which has been proposed to connect two existing interstate highways (I-5 and I-405) near Seattle. Most of the relevant facts are set out in Lathan v. Volpe, 9 Cir., 1971, 455 F.2d 1111, 1114. The following events have occurred since that decision:

In an attempt to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, and with our mandate in Lathan v. Volpe, *supra,* the Washington State Department of Highways (WSDH) prepared an environmental impact statement (EIS) for the so-called "Seattle segment" of I-90.[2] The EIS was approved by the Secretary of Transportation on May 5, 1972. Shortly thereafter WSDH sought and obtained Federal Highway Administration (FHWA) approval of the design of the Seattle segment. On August 4, 1972, in response to a motion by intervenors Citizens Against Freeways (Citizens), the district court ruled that the EIS did not satisfy the requirements of NEPA and that the statement required by 49 U.S.C. § 1653(f) and 23 U.S.C. § 138 regarding the proposed taking of parkland (the 4(f) statement) was inadequate. The court continued in effect its order enjoining the further ac-

---

1. *See generally* Brooks v. Volpe, 9 Cir., 1972, 460 F.2d 1193; Lathan v. Volpe, 9 Cir., 1971, 455 F.2d 1111; Daly v. Volpe, W.D. Wash., 1972, 350 F.Supp. 252; Lathan v. Volpe, W.D.Wash., 1972, 350 F.Supp. 262; Brooks v. Volpe, W.D.Wash., 1972, 350 F. Supp. 269.

2. This illustrates the practice of state highway departments of dividing proposed freeway projects into small segments for purposes of applying for funding. While this practice is certainly rational in view of the way in which Federal-aid highway funds are allocated, it makes coherent environmental planning extremely difficult. *See* Peterson and Kennan, The Federal-Aid Highway Program: Administrative Procedure and Judicial Interpretation, 2 Env.L.Rep. 50001 (1972). For the sake of clarity, this opinion will refer to the entire five-mile segment of I–90 involved in this case as the "freeway segment," and the portion for which an environmental impact statement has been prepared will be referred to as the "Seattle segment."

quisition of land in the proposed freeway corridor until proper impact and 4(f) statements were prepared and circulated. However, the court refused to order new public hearings for the project pursuant to 23 U.S.C. § 128(a) and struck Citizens' belatedly raised claim that the Secretary of Transportation, rather than WSDH, must prepare the impact statement. These appeals followed.

### I. *The Section 128(a) Hearing.*

Citizens argues that a new public hearing must be held pursuant to 23 U. S.C. § 128(a).

Consideration of this issue requires an exposition of the history of relevant statutes, regulations, and policy memoranda that have been in effect during the time when the I-90 freeway segment was being planned, and what has been done to comply with them up to now.

Under the Federal-Aid Highway Act,[3] 23 U.S.C. § 101 et seq.,[4] primary responsibility for highway planning, design and construction rests on state highway departments, aided by federal assistance.[5] The FHWA, which administers the Federal-Aid Highway Program, ascertains that the state highway departments have adhered to federal law and regulations before authorizing reimbursement to the states for a portion of the federal-aid highways' cost. This adherence to federal standards is assured by requiring the state highway departments to obtain federal approval at various stages during the conception and building of a highway project.

The matrix of rules governing the stages of FHWA approval is found not only in the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq., but also in the Code of Federal Regulations and numerous FHWA directives, including Policy and Procedure Memoranda (PPM's), Instructional Memoranda (IM's) and Administrative Memoranda (AM's).[6]

3. For a thorough statutory history of the Federal-Aid Highway Act, *see* Mashaw, The Legal Structure of Frustration: Alternative Strategies for Public Choice Concerning Federally Aided Highway Construction, 122 U.Pa.L.Rev. 1, 5–12 (1973).

4. Under 23 U.S.C. § 103, the Federal-Aid Highway Program consists of three systems: (1) the Interstate System (§ 103(d)), which is to "connect . . . the principal metropolitan areas" and "serve the national defense. . . ." (2) the Federal-aid primary system (§ 103(b)), which "shall consist of an adequate system of connected main highways"; and (3) the Federal-aid secondary system (§ 103(c)), which may include "farm-to-market roads, rural mail routes, public school bus routes, local rural roads, county roads, township roads, and roads of the county road class . . . ." I–90 is part of the Interstate System.

5. Pursuant to 23 U.S.C. § 120(c), the federal government pays 90% of the total cost of projects which form part of the Interstate System. Federal appropriations have been funded since 1956 by highway user taxes deposited into the Highway Trust Fund, which was created under the Federal-Aid Highway Act of 1956, Act of June 29, 1956, ch. 462, Tit. II, § 209, 70 Stat. 397.

6. We must and do give considerable deference to the regulations promulgated by the Secretary of Transportation and published in the Code of Federal Regulations. 23 U.S.C. § 315 authorized the Secretary of Commerce to "prescribe and promulgate all needful rules and regulations for the carrying out of the provisions of this title." This authorization was transferred to the Secretary of Transportation in 1966 pursuant to 49 U.S. C. § 1655(a). *See generally* K. Davis, Administrative Law Treatise, § 5.04 (1970 Supp.)

The legal effect of the PPM's, IM's and AM's however, is much less clear. The Department of Transportation has ruled that the FHWA's memoranda and orders do not rise to the status of regulations: "The [Federal Highway] Administrator shall promulgate and require the observance of policies and procedures, and may take other action as he deems appropriate or necessary for carrying out the provisions and purposes of Federal laws, the policies of the Federal Highway Administration, and the regulations in this part. No such direction, policy, rule, procedure, or interpretation contained in a Federal Highway Administration order or memorandum shall be considered a regulation or create any right or privilege not specifically stated therein." 23 C.F.R. § 1.-32(a) (1973). But see Gray, Environmental Requirements of Highway and Historic Preservation Legislation, 20 Catholic U.L. Rev. 45, 61–2, n. 66 (1970).

The key concept in the Federal-Aid Highway Program is the "project." For example, state highway departments must submit "programs of proposed projects" for approval under 23 U.S.C. § 105(a), and section 106(a) requires approval of plans, specifications and estimates for "each proposed project" included in a program approved under section 105(a). Unfortunately, a "project" assumes chameleon-like characteristics under the Act.[7] For example, a state highway department could seek to obtain FHWA approval of a "project" which includes all the items of work necessary to construct Interstate X, a fifty-mile highway. On the other hand, it could also submit to the FHWA several "projects," each of which forms a part of highway X. Thus, the department might simply submit a grading and paving "project" for twenty miles of I-X, or a right-of-way acquisition "project" for five miles of I-X, or simply a demolition "project" for one mile of the highway.[8] The statutory and regulatory definitions of "project" are broad enough to embrace a one-mile demolition "project" or a fifty-mile planning, surveying, mapping, right-of-way acquisition, relocation assistance, demolition, grading and paving "project."[9]

With this caveat, we proceed to examine the statutory, regulatory and administrative scheme controlling this litigation.[10]

1. *Program approval.*

The first decision that must be made by the FHWA is whether to approve a state's federal-aid highway program. Under 23 U.S.C. § 105(a), a state highway department "of any State desiring to avail itself of the benefits of this chapter shall submit to the Secretary for his approval a program or programs of proposed projects for the utilization of the funds apportioned." Every project in a proposed program must be "located upon an approved Federal-aid system," or it will not receive approval. The Secretary may approve a program in whole or simply approve individual projects within a program. *Id.*

2. *Public hearings.*

a. *Those that have been held.*

(1) *The 1963 hearing.*

23 U.S.C. § 128(a) provides that any state highway department which submits plans for a federal-aid highway project involving the "going through" of a city must certify to the Secretary that it has held public hearings and has considered the effect of such locations. As originally enacted,[11] section 128(a) required only that the *economic* effects of

---

7. *Cf.* Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dep't, 5 Cir. 1971, 446 F.2d 1013, 1022–1024.

8. *See* Peterson and Kennan, *supra*, n. 2 at 50003.

9. Section 101(a) of the Act defines the term "project" to mean "an undertaking to construct a particular portion of a highway, or if the context so implies, the particular portion of a highway so constructed." That section defines the term "construction" to mean

"the supervising, inspecting, actual building, and all expenses incidental to the construction or reconstruction of a highway, including locating, surveying, and mapping . . ., acquisition of rights-of-way, relocation assistance, elimination of hazards of railway grade crossings, acquisition of replacement housing sites, acquisition and rehabilitation, relocation, and construction

of replacement housing, and improvements which directly facilitate and control traffic flow, such as grade separation of intersections, widening of lanes, channelization of traffic, traffic control systems, and passenger loading and unloading areas." 23 U.S.C. § 101(a).

23 C.F.R. § 1.2(b) (1973) defines a "project" as "[a]n undertaking by a State highway department for highway construction, including preliminary engineering, acquisition of rights-of-way and actual construction, or for highway planning and research, or for any other work or activity to carry out the provisions of the Federal laws for the administration of Federal aid for highways."

10. *See also* Lathan v. Volpe, *supra*, 455 F.2d at 1114–1116. *But see* Peterson and Kennan, *supra*, n. 2, at 50017–18.

11. Act of Aug. 27, 1958, Pub.L. No. 85–767, 72 Stat. 902.

such a highway be considered at the hearing.

This was the statute in effect when, in 1963, WSDH held a corridor or location hearing on the freeway segment. (See Lathan v. Volpe, *supra*, 455 F.2d at 1114.) At that time there was no Regulation dealing with such a hearing; it was governed by a PPM. In Lathan v. Volpe, *supra*, we rejected an attack, based upon due process grounds, upon the validity of this 1963 hearing. 455 F.2d at 1122. We assume, for the purpose of this decision, that the hearing complied with § 128(a) as it then read, and with the then applicable PPM. Thereafter, the FHWA approved the proposed location or corridor.

### (2) *The 1970 hearing.*

Section 128(a) was amended effective August 23, 1968,[12] to require that the hearings also consider the social and environmental impact of the proposed highway. The amended version reads as follows (the requirements added in 1968 are italicized):

12. Act of Aug. 23, 1968, Pub.L. No. 90–495, § 24, 82 Stat. 828.

13. See n. 2, *supra*.

14. PPM 20–8, *quoted in* 3 Env.L.Rep. 46505:
4. *DEFINITIONS*
(As used in this PPM)
\* \* \* \* \*
"b. A 'highway design public hearing' is a public hearing that:
(1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;
(2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and
(3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs.
c. 'Social, economic, and environmental effects' means the direct and indirect benefits or losses to the community and to highway users. It includes such effects that are relevant and applicable to the particular location or design under consideration such as:

"Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic *and social* effect of such a location, *its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.*"

On January 1, 1970, the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, became effective. We discuss its impact on the hearing issue later in this opinion.

On June 2–6, 1970, WSDH held a design public hearing on the Seattle segment.[13] This hearing was governed by PPM 20–8, effective January 14, 1969. It defines and describes a "highway design public hearing" as set out in the margin.[14] Federal approval of the

(1) Fast, safe and efficient transportation.
(2) National defense.
(3) Economic activity.
(4) Employment.
(5) Recreation and parks.
(6) Fire protection.
(7) Aesthetics.
(8) Public utilities.
(9) Public health safety.
(10) Residential and neighborhood character and location.
(11) Religious institutions and practices.
(12) Conduct and financing of Government (including effect on local tax base and social service costs).
(13) Conservation (including erosion, sedimentation, wildlife and general ecology of the area).
(14) Natural and historic landmarks.
(15) Noise, and air and water pollution.
(16) Property values.
(17) Multiple use of space.
(18) Replacement housing.
(19) Education (including disruption of school district operations).
(20) Displacement of families and businesses.
(21) Engineering, right-of-way and construction costs of the project and related facilities.

design was received on June 23, 1972. Again, we assume that the hearing complied with these requirements.

b. *The question whether there must be another hearing.*

In December, 1970, section 128(a) was further amended [15] to require the state to file a report with the Secretary indicating the consideration given to the economic, social, environmental and other effects of a proposed highway.

The Secretary has now adopted regulations governing "corridor" and "design" hearings. Part 790 of 23 Code of Federal Regulations (1973) expands upon the requirements of section 128(a). The purpose of these regulations

"is to insure, to the maximum extent practicable, that highway locations and designs reflect and are consistent with Federal, State, and local goals and objectives. The rules, policies, and procedures established by this part are intended to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments before submission to the Federal Highway Administration (FHWA) for approval. They provide a medium for free and open discussion

and are designed to encourage early and amicable resolution of controversial issues that may arise." 23 C.F.R. § 790.1(a) (1973).

The regulations require a state highway department to obtain two FHWA approvals in order to receive federal reimbursement: "route location approval," which follows a "corridor public hearing," [16] and "design approval," [17] which follows a "design public hearing." [18]

The regulations thus require that the state highway departments must hold two public hearings, or provide an opportunity for those hearings.[19] First, there must be a "corridor public hearing," which is held "to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the need for, and the location of, a Federal-aid highway." 23 C.F.R. § 790.3(a)(2) (1973). It must provide "a public forum that affords a full opportunity for presenting views on each of the proposed alternative highway locations and the social, economic, and environmental effects of those alternate locations." 23 C.F.R. § 790(a)(3) (1973).

Second, the state highway department must hold a "highway design public

(22) Maintenance and operating costs of the project and related facilities.

(23) Operation and use of existing highway facilities and other transportation facilities during construction and after completion. This list of effects is not meant to be exclusive, nor does it mean that each effect considered must be given equal weight in making a determination upon a particular highway location or design.

\* \* \* \* \*

9. *CONSIDERATION OF SOCIAL, ECONOMIC, AND ENVIRONMENTAL EFFECTS*

State highway departments shall consider social, economic, and environmental effects before submission of requests for location or design approval, whether or not a public hearing has been held. Consideration of social, economic, and environmental effects shall include an analysis of information submitted to the State highway department in connection with public hearings or in response to the notice of the location or design for which a State highway department

intends to request approval. It shall also include consideration of information developed by the State highway department or gained from other contacts with interested persons or groups.

10. *LOCATION AND DESIGN APPROVAL*

\* \* \* \* \*

(b) Design study reports must describe essential elements such as design standards, number of traffic lanes, access control features, general horizontal and vertical alignment, right-of-way requirements and location of bridges, interchanges, and other structures."

15. Act of Dec. 31, 1970, Pub.L. No. 91–605, Tit. I, § 135, 84 Stat. 1734.

16. *See* 23 C.F.R. § 790.9(e)(1)(ii) (1973).

17. *See* 23 C.F.R. § 790.3(d) (1973).

18. *See* 23 C.F.R. § 790.9(e)(2)(iii) (1973).

19. *See* 23 C.F.R. §§ 790.1(b), 790.5(a) (1973).

hearing," which is held "to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway," and to provide "a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs." 23 C.F.R. § 790.3(b)(2)–(3).[20]

█ Neither location approval nor design approval by the FHWA creates a contractual obligation on the part of the federal government to reimburse a state for costs incurred in the project. There is one more stage to be completed before the federal government is finally committed to the project. This is called plans, specifications and estimates approval (PS&E approval).

After a state highway department has certified to the Secretary that it has held appropriate section 128(a) hearings, or has afforded the opportunity for such hearings, the state department must

"submit to the Secretary for his approval, as soon as practicable after program approval, such surveys, plans, specifications, and estimates for each proposed *project* included in an approved program as the Secretary may require. . . . [The Secretary's] approval of any such *project* shall be deemed a contractual obligation of the Federal Government. . . ." 23 U.S.C. § 106(a) (emphasis supplied).

█ The federal government is not obligated to fund a project until the Secretary has given approval to a project. Monroe County Conservation Council, Inc. v. Volpe, 2 Cir., 1972, 472 F.2d 693, 699. After PS&E approval has been given to a "project," a state is entitled to full reimbursement of the federal government's share of the project's cost if the department has conformed to all applicable federal laws.[21] It is im-

---

**20.** The "social, economic, and environmental effects" which must be considered in both a corridor hearing and a design hearing (*see* 23 C.F.R. §§ 790.3(a)(3) and (b)(3) (1973)) are now defined in 23 C.F.R. § 790.3(c) (1973):

"(c) 'Social, economic, and environmental effects' means the direct and indirect benefits or losses to the community and to highway users. It includes such effects that are relevant and applicable to the particular location or design under consideration as to:

(1) Regional and community growth including general plans and proposed land use, total transportation requirements, and status of the planning process.

(2) Conservation and preservation including soil erosion and sedimentation, the general ecology of the area as well as manmade and other natural resources, such as: park and recreational facilities, wildlife and waterfowl areas, historic and natural landmarks.

(3) Public facilities and services including religious, health, and educational facilities; and public utilities, fire protection and other emergency services.

(4) Community cohesion including residential and neighborhood character and stability, highway impacts on minority and other specific groups and interests, and effects on local tax base and property values.

(5) Displacement of people, businesses, and farms including relocation assistance, availability of adequate replacement housing, economic activity (employment gains and losses, etc.).

(6) Air, noise, and water pollution including consistency with approved air quality implementation plans, FHWA noise level standards, and any relevant Federal or State water quality standards (as set forth in Parts 770, 771, 772, and 773 of this chapter).

(7) Aesthetic and other values including visual quality, such as: 'view of the road' and 'view from the road,' and the joint development and multiple use of space.

This listing is not meant to be exclusive, nor does it mean that each effect considered must be given equal weight in making a determination upon a particular highway location or design."

**21.** Under 23 U.S.C. § 110(a), the Secretary cannot enter into a "formal project agreement" with a state highway department until he has given PS & E approval, and under 23 U.S.C. § 121(c), no federal payments may be made unless the project is located on a Federal-aid highway system and is covered by a project agreement. Moreover, under

portant to emphasize that PS&E approval is given to an individual "project," which, as noted *infra*, p. 13, may consist of all the work on an entire highway or merely the right-of-way acquisition for an interchange.

The question now before us is whether the WSDH must now hold, before applying for PS&E approval, another hearing complying with section 128(a) as it now reads, and as it may be affected by NEPA.

■■ The parties have framed the question in terms of "retroactivity"— i. e., are amended section 128(a) and NEPA "retroactive" so that a new "corridor" or "location" hearing must be held, or a new "design" hearing must be held, thus in effect "nullifying" the two hearings that have been held. This position misses the mark. I-90 is an ongoing project, to which the federal government is not yet committed because there has been as yet no PS&E approval. The district court sits in this case as a court of equity, as do we, and it is well settled that a court of equity may, and often does, apply the law in effect at the time of judgment, rather than that in effect when the action is filed. Chapman v. Sheridan-Wyoming Co., 1950, 338 U.S. 621, 630, 70 S.Ct. 392, 94 L.Ed. 393.

Moreover, we have no doubt that the Congress can require that there now be a hearing complying with amended section 128(a) and with the policies of NEPA, and we are of the opinion that it has done so.

First, section 128(a) speaks in the present tense:

"Any State highway department which *submits* plans . . . shall certify to the Secretary that it has had public hearings . . . and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of

such urban planning as has been promulgated by the community." (Emphasis supplied)

This is the law currently in effect. Moreover, to obtain PS&E approval, WSDH must submit plans, specifications and estimates to FHWA. When it does so, it must have held a hearing or hearings at which consideration has been given to the matters now listed in section 128(a), or it must have afforded the opportunity for such hearings.

■ This view of the statute's present effect upon the inchoate I-90 project is strengthened by the adoption of NEPA. In that statute, the Congress, recognizing "the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," declares that it is the policy of the federal government "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). To realize this goal, Congress has directed that, *"to the fullest extent possible . . .* the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies" of NEPA. 42 U.S.C. § 4332(1). (Emphasis added)

The meaning of the phrase "to the fullest extent possible" was clearly expressed by the Senate and House conferees who wrote the language:

"[I]t is the intent of the conferees that the provision 'to the fullest extent possible' shall not be used by any Federal agency as a means of avoiding compliance with the directives set out in section [4332]. Rather, the language in section [4332] is intended to assure that all agencies of the Federal Government shall comply with the directives set out in said section 'to the fullest extent possible' under

23 U.S.C. § 121(b), a state is entitled to final payment from the federal government only if the project has been completed "in

accordance with the plans and specifications. . . ."

their statutory authorizations and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." [22]

The language "to the fullest extent possible" indicates an intent to apply NEPA's standards to ongoing projects such as I-90. It has been so construed by the Council on Environmental Quality, a NEPA-created entity. Its language concerning the applicability of NEPA's requirement of environmental impact statements to ongoing projects demonstrates the approach which should also be taken to the question of section 128(a) hearings. To paraphrase:

"To *the maximum extent practicable* the Section [128(a)] procedure should be applied to further major Federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to the enactment of [NEPA] on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. *It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program.*" Council on Environmental Quality, Statements on Proposed Federal Actions Affecting the Environment—Guidelines ¶ 11, 36 Fed.Reg. 7724, 7727 (April 23, 1971). (Emphasis added)

It is clear that "further major Federal actions having a significant effect on the environment" will occur here. As noted earlier, formal federal commitment to this project has not yet occurred, because no PS&E approval has been given. The Federal-Aid Highway Act envisions numerous areas of further federal participation beyond corridor and design approval: aiding states in the acquisition of rights-of-way,[23] regulation of the letting of contracts,[24] final inspection and approval before construction,[25] and reimbursement to the states of construction costs,[26] to name but a few.[26a]

█ Although WSDH and the federal government have had various formal and informal contracts since 1963 concerning the freeway segment, the Secretary of Transportation has not given PS&E approval to this "project," and the federal government is therefore not contractually obligated to provide highway aid, 23 U.S.C. § 106(a). If and when the Secretary does give PS&E approval to the freeway segment, however, he must apply the law which is in effect when he commits federal funds to the project. This means that there must have been a hearing held or opportunity for a hearing in compliance with section 128(a) as it now reads, at which the matters considered include those now specified in section 128(a) and those now specified in NEPA, particularly 42 U.S.C. § 4332(2)(C) and (2)(D).[27]

We cannot ignore, as judges, what we know as citizens. The knowledge and

---

**22.** 115 Cong.Rec. 40417, 40418 ("Major Changes in S. 1075 as Passed by the Senate"); 115 Cong.Rec. 39701, 39703 (House Conference Report on S. 1075).

**23.** *See* 23 U.S.C. § 107.

**24.** *See* 23 U.S.C. § 112.

**25.** *See* 23 U.S.C. § 114(a).

**26.** *See* 23 U.S.C. § 121.

**26a.** By listing these examples we do not at all imply that there must be an additional section 128(a) hearing before each step is taken. See page 690, *infra.*

**27.** "(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

attitudes of the public, of the Congress, and of state and local governments about the environmental and social consequences of freeway building have drastically changed within the last decade. With knowledge has come concern, and that concern is reflected in the 1968 and 1970 amendments to section 128(a) and in NEPA. The proposed segment of I-90 is to be built in the future, and decisions about it are to be governed by the law as it reads now, not as it read in 1963.

In short, we hold under the facts here that the policies of NEPA and section 128(a) must be construed together and that section 128(a) provides a public forum at which, among other things, the NEPA required EIS will be a basis for the hearing.

 In so holding, we have the support of our own prior decisions, and of those of other circuits. We have held that agencies are not relieved of the obligation to evaluate the environmental consequences of their actions merely because a particular project was initiated before the effective date of NEPA. *See* Jicarilla Apache Tribe of Indians v. Morton, 9 Cir., 1973, 471 F.2d 1275, 1282–1283; Lathan v. Volpe, *supra*, 455 F.2d at 1120–1121. With respect to

> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
> ❊ * ❊ * ❊
> (D) study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources".

28. While the court in *Arlington Coalition* states at one point that "P. S. & E. approval has not yet been given," 458 F.2d at 1332, the court at another point states that "by July 28, 1966, acquisition-of-right-of-way agreements between the state highway department and the Secretary had been entered into for the entire project," and the state had been reimbursed $28,679,123.07. *Id.* at

ongoing projects, section 128(a) and the regulations which implement it must be interpreted and administered, "to the fullest extent possible," in accordance with the policies of NEPA. In appropriate cases this may mean total reassessment of the project in light of its potential environmental impact, i. e., the consideration of its wholesale alteration or abandonment. *Cf.* Jicarilla Apache Tribe of Indians v. Morton, *supra*.

 Although NEPA itself does not provide for public hearings, its general directives contain one clear message: Environmental protection is a part of every federal agency's mandate; the Act requires "agencies to *consider* environmental issues just as they consider other matters within their mandates." Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, 1971, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112. (Emphasis in original) Section 128(a) provides the forum for doing so. In cases in which the Secretary has not given PS&E approval to a project, other Circuits have ordered new section 128(a) hearings. Monroe County Conservation Council v. Volpe, 2 Cir., 1972, 472 F.2d 693, 701–702; Arlington Coalition on Transp. v. Volpe, 4 Cir., 1972, 458 F.2d 1323, 1337–1338.[28]

1328. The court therefore may have meant to say at p. 1332 that no PS & E approval *for construction* had yet been given.

In *Monroe County*, the state highway department had not yet submitted its plans, specifications and estimates, but it was undisputed that the federal government was prepared to give PS & E approval after submission; *see* 472 F.2d at 696.

Where the highway in question has actually been under construction, it has been held that the amendments do not apply. Wildlife Preserves, Inc. v. Volpe, 3 Cir., 1971, 443 F.2d 1273. That is not this case. *See also* Ragland v. Mueller, 5 Cir., 1972, 460 F.2d 1196, and Pennsylvania Environmental Council, Inc. v. Bartlett, 3 Cir., 1971, 454 F.2d 613, in which the courts held that NEPA did not apply to Federal-Aid Highway projects in cases in which PS & E approval had been given by the Secretary prior to January 1, 1970, and construction on the highways in question had begun as of the time the lawsuit was commenced. In *Ragland*, for example, sixteen of the twenty miles

■ We think that section 128(a) embodies its own test as to when a hearing must have been held—before WSDH "submits plans"—i. e., in this case before WSDH seeks PS&E approval. We therefore do not discuss the relative merits of the "tests" adopted in *Arlington Coalition, supra,* and in *Monroe County, supra.* We do not mean that there must have been a new hearing every time that WSDH submits some change in plans to the Secretary. We are fully aware of the complexity of such a major project as the I–90 segment, and of the fact that, in such a project changes in plans may be necessary as planning or actual work proceeds. We refer only to major submission, and these are set out in the Federal-Aid Highway Act and the Secretary's regulations as we have outlined them in this opinion.

Nor are repeated section 128(a) hearings required in any case in which a hearing, fully complying with section 128(a) and the policies of NEPA, has once been held, at least absent some really drastic changes in plans occurring thereafter.

■ We stress that the hearing under section 128(a) must take into account the factors that are now outlined in that section and in NEPA. It will not be merely a new "corridor" or "location" hearing or "design" hearing, although of course what was considered at those hearings can be considered. The major focus must be on the total impact of the project as a whole, including whether it should be built at all, as well as whether, if it is to be built, it should be built where and as previously planned.

c. *The claimed sufficiency of the June, 1970, hearing.*

■ To all of the foregoing the state defendants respond that the design hearing that was held in June of 1970 did comply with section 128(a) as amended, that the matters that we have outlined were considered at that hearing, and that

in addition WSDH has had a large number of meetings with interested persons and groups at which the same matters were considered. In short, they claim that there has been substantial compliance with section 128(a), and that no further hearing should be required. On the record before us, we cannot tell whether this claim is sustainable. We do note at least one weakness in it. At the time of the hearing, no EIS had been prepared, and it was the position of WSDH that none was required. See Lathan v. Volpe, *supra,* 455 F.2d at 1120–1121. Thus it is not as likely that full consideration was given to the environmental impact of I–90 as would have been given had there been an EIS available for discussion at the hearing. Nevertheless, because the point is strongly pressed, the district court on remand may, if it wishes, consider this claim.

The district court may feel, however, that the case can and should be disposed of more expeditiously by requiring a new hearing or opportunity for a hearing, of the type that we have outlined. The district court might feel that a decision that the June, 1970, hearing was sufficient would simply invite another appeal and further delay. This question we leave to the district court.

WSDH has advised us that the state and FHWA have now prepared a new EIS for the Seattle segment "in strict compliance with" the district court's order, entered following our remand. A copy has been lodged with this court. We decline to consider whether it complies with the district court's order. That is for the district court. However, assuming that the proper administrative approval has been received, this new EIS should form one of the bases of the new section 128(a) hearing, if such hearing is ordered. The importance of the EIS in the decision-making process cannot be underestimated; the EIS

"seeks to ensure that each agency decision maker has before him and takes

of the disputed highway had been fully completed as of January 1, 1970, the effective date of NEPA. *See also* Citizens Environ-

mental Council v. Volpe, 10 Cir., 1973, 484 F.2d 870.

into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made." Calvert Cliffs' Coordinating Comm. Inc. v. United States Atomic Energy Comm'n, *supra,* 449 F.2d at 1114.

▇ The new EIS should also be made available to the public before the section 128(a) hearings. See FHWA PPM 90–1 at ¶ 6c (August 24, 1971), quoted in 3 Env.L.Rep. 46106, 46108. Of course, the hearing itself should not necessarily be limited to the contents of the new EIS. The hearing is "meant to be a 'town hall' type meeting in which people are free to express their views. The hearing was not intended to be a quasi-judicial or adversary legal type hearing." H.Rep.No. 91–1554, 91st Cong., 2d Sess. (1970), quoted in 1970 U.S.Code Cong. & Admin.News, pp. 5392, 5396.

▇ Defendants urge expedition in the disposition of this case. They represent that the costs of construction are rising at the rate of more than $30,000,-000 per year. Furthermore, they have pointed to 23 U.S.C. § 103(g), which provides, in part:

"Any segment of the Interstate System, with respect to which a State has not submitted by July 1, 1975, a schedule for the expenditure of funds for completion of construction of each segment or alternative segment within the period of availability of funds authorized to be apportioned for completion of the Interstate System, and with respect to which the State has not provided the Secretary with assurances satisfactory to him that such schedule will be met, shall be removed from designation as a part of the Interstate System."

We agree that the district court should proceed with expedition. *Cf.* Lathan v. Volpe, *supra,* 455 F.2d at 1120–1121.

d. *Res judicata and laches.*

▇ The defendants argue that our mandate in Lathan v. Volpe, *supra,* is *res judicata* on the section 128(a) question, because we there rejected Citizens' due process challenge to the 1963 corridor hearing.[29] This is not correct. The case has not proceeded to final judgment, and the applicable doctrine is therefore law of the case, not *res judicata.* *See* 1B J. Moore, Federal Practice ¶ 0.404[1] (2d ed. 1974). Although the object of both rules of law is finality in litigation, the former doctrine applies only to foreclose the reconsideration of matters actually decided. *See* Electrical Research Prod. v. Gross, 9 Cir., 1941, 120 F.2d 301, 307, 10 Alaska 94.[30] All that we decided in Lathan v. Volpe, *supra,* was that the plaintiffs' attack on the 1963 hearing, on procedural due process grounds, was barred by laches. Because we did not consider the effects of the section 128(a) amendments on the previous appeal, that issue is properly before us now. *Id.*

▇ Nor can we say that the doctrine of laches precludes plaintiffs from raising the section 128(a) issue. "Lach-

29. We there stated:
"Plaintiffs third contention is that the 1963 public hearings on the proposed location of I–90 deprive them of certain procedural rights guaranteed by due process of law. We need not decide the merits of this contention, since we think the equitable defense of laches is available to defendants. Plaintiffs failed to raise this claim for over seven years after the hearing took place, during which time they knew of the hearing and its alleged deficiencies. Defendants have expanded a substantial sum of money in reliance on the validity of that proceeding. Thus the two essential elements of laches—lack of diligence by plaintiff and injurious reliance thereon by defendant—are present and plaintiffs are precluded from challenging the validity of the hearing at this late date." 455 F.2d at 1122.

30. *See also* DePinto v. Landoe, 9 Cir., 1969, 411 F.2d 297 (court of appeals had expressly reserved the issue).

es requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 1961, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551. It cannot be said here that plaintiffs have slept on their rights since 1963; the earliest date that this claim arose was August 23, 1968, the effective date of the initial amendments to section 128(a). Moreover, NEPA, which has a substantial influence upon our interpretation of the effects of the amendments, *see supra*, was not operative until January 1, 1970, less than six months before this action was filed. Thus, Citizens has not been guilty of an extreme lack of diligence in raising this issue. Moreover, WSDH has not sufficiently demonstrated the extent of its reliance upon whatever delay there may have been. Under these circumstances, the doctrine of laches should not be applied to bar the litigation of this important public issue. *Cf.* Arlington Coalition on Transp. v. Volpe, *supra*, 458 F.2d at 1329–1330; Ward v. Ackroyd, D.Md., 1972, 344 F.Supp. 1202, 1212–1213. We do not here attempt to set out a rule for future highway litigation, since the question of whether laches bars an action in a particular case depends upon the facts and circumstances of that case and is a question addressed primarily to the discretion of the trial court. Burnett v. New York Central R. R. Co., 1965, 380 U.S. 424, 435, 85 S.Ct. 1050, 13 L.Ed.2d 941; Gardner v. Panama R. R. Co., 1951, 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31.

Finally, as we have previously stated, the issue here is not the validity of the 1963 hearing. We do not doubt its validity. The issue is whether present law should now be applied to this partially inchoate major federal project.

## II. *The Environmental Impact Statement and Section 4(f) Issues.*

As we have seen, WSDH now maintains that a proper EIS and 4(f) statement regarding the Seattle segment has been prepared. It has thus virtually abandoned its cross-appeal. Nevertheless, we consider the question because there may be further attack on the EIS on remand.[31]

The Administrative Procedure Act, 5 U.S.C. § 706, prescribes the scope of review. So far as pertinent here, it provides:

'. . . The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\* \* \* \* \* \*

(D) without observance of procedure required by law."

▮▮▮▮ Subsection (2)(A) refers primarily to substantive decisions committed to the Agency in the first instance. It may be applicable (we do not say that it is) where it is claimed that the Agency, in deciding whether to proceed with a project, has ignored conclusions or considerations stated in an EIS. Such a question is for the Agency, not the courts, to decide. The scope of judicial review in such a case is narrow, if review be available at all. *See* 5 U.S.C. § 701(a)(2); Citizens to Preserve Overton Park v. Volpe, 1971, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136; Environmental Defense Fund, Inc. v. Armstrong, 9 Cir., 1973, 487 F.2d 814, 822, n. 13. We could reverse the Agency, if at all, only in a rare case, and only if

---

31. Citizens argues also that the district court erred in permitting WSDH to attach summaries and comments to the environmental impact statement, rather than the comments in their entirety. Although the federal defendants argue that the district court's order is essentially correct, WSDH has stated that it intends to attach all comments received. This concession disposes of the issue in light of our conclusion that Citizens cannot challenge the district court's order permitting WSDH to prepare the impact statement.

we found its action arbitrary, capricious, an abuse of discretion, or contrary to law. We could not substitute our judgment for that of the Agency. *See* Jicarilla Apache Tribe of Indians v. Morton, 9 Cir., 1973, 471 F.2d 1275, 1279–1280, 1281; Citizens to Preserve Overton Park, *supra,* 401 U.S. at 416, 91 S.Ct. 814.

On the other hand, subsection (2)(D) provides that we may set aside agency action if we find it to be without observance of procedure required by law. We regard the question whether an EIS complies with the requirements of NEPA as a procedural question, governed by § 706(2)(D). *See* Jicarilla Apache Tribe, *supra,* 471 F.2d at 1280–1281. In Life of the Land v. Brinegar, 9 Cir., 1973, 485 F.2d 460, 469, we quoted *Jicarilla Apache Tribe, supra,* regarding substantive decisions, but then apparently applied § 706(2)(A) to the question whether the EIS satisfied the requirements of NEPA. This appears to be a misreading of *Jicarilla Apache Tribe,* but our reading of *Life of the Land* convinces us that the result would be no different if we had thought that § 706 (2)(D) applied. We later said as much in *Environmental Defense Fund, supra,* 487 F.2d at 815, n. 7.

 We stand on § 706(2)(D) because NEPA is essentially a procedural statute. Its purpose is to assure that, by following the procedures that it prescribes, agencies will be fully aware of the impact of their decisions when they make them. The procedures required by NEPA, 42 U.S.C. § 4332(2) (C), are designed to secure the accomplishment of the vital purpose of NEPA. That result can be achieved only if the prescribed procedures are faithfully followed; grudging, *pro forma* compliance will not do. We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA than if thy confine themselves within the straight jacket of § 706(2)(A). *See* Wyoming Outdoor Co-

ordinating Council v. Butz, 10 Cir., 1973, 484 F.2d 1244.

As Mr. Justice Frankfurter said in a criminal case, in words that are equally applicable to the actions of administrative agencies: "The history of liberty has largely been the history of observance of procedural safeguards." McNabb v. United States, 1943, 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819. So it may also be with the history of environment. *See also* Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n, D.C.Cir., 1971, 449 F.2d 1109, 1114–1115; Silva v. Lynn, 1 Cir., 1973, 482 F.2d 1282.

 This does not mean that the courts are to "fly speck" environmental impact statements. The preparation of such a statement necessarily calls for judgment, and that judgment is the agency's. But the courts can, and should, require full, fair, bona fide compliance with NEPA. That is what the district judge did in this case.

 It was not an abuse of discretion for the district court to strike Citizens' request that the Secretary of Transportation be ordered to prepare the EIS. The issue was raised for the first time in a brief which was not served on the defendants until the day of the hearing, and was inconsistent with Citizens' earlier motion to compel WSDH to prepare an adequate impact statement.

 The district court did not err in permitting the inadequate EIS to be re-circulated as a draft. Circulation of a grossly inadequate statement as the draft of a new one could conceivably frustrate the goal of obtaining informed agency and public comment on the environmental consequences of a proposed project, and in some circumstances this could amount to a violation of the responsible agency's duty to "develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. §

4332(2)(B). However, Citizens has not demonstrated that this is such a case.

We think that the motion of plaintiffs-appellants and intervenors for attorney's fees should be considered in the first instance by the district court.

That part of the judgment which refuses to order a hearing under section 128(a) is vacated. In all other respects, the judgment is affirmed. The case is remanded for further proceedings consistent with this opinion.

Circuit Judges KOELSCH, ELY and HUFSTEDLER do not concur in the portion of the opinion that holds that the district court may, on remand, consider whether there has already been substantial compliance with section 128(a). They would hold that there has not been such compliance.

WALLACE, Circuit Judge (concurring):

I concur generally with the majority. I disagree that the case should be remanded for the district court to consider whether new hearings need now be held pursuant to 23 U.S.C. § 128(a). The question whether the hearings required by section 128(a) have been held is immaterial until the state highway department submits plans for a federal-aid highway project. At that time, section 128(a) requires that the state highway department "shall certify to the Secretary that it has had [the requisite] public hearings . . . ." If the state highway department decides not to submit plans, the question never arises. Once it does submit plans, compliance with section 128(a) is necessary, and appropriate judicial proceedings may be instituted to challenge the certification that required hearings have been held.

In the instant case, there has been no submission of plans and thus no certification. An action raising the question whether the hearings complied with section 128(a) is, therefore, premature. It is the responsibility in the first instance of the state highway department to hold such hearings as it deems necessary and to make the required certification to the secretary when it submits plans.

In addition, I cannot concur with the statements, which I deem to be dicta, pertaining to what constitutes further major federal action on this project. The majority concludes, without the benefit of briefs or argument, that certain actions are further major federal actions. I believe wisdom dictates that we wait before we make such a determination until a record raising this question is properly before us. It is at least equally arguable that once the final engineering design stage has been approved, all major federal action has been completed. At that point, the eventual impact on the environmental has been established. Each house that is moved, each mound of dirt that is excavated, each ribbon of concrete that is laid has an impact on the environment, but that impact is determined by the plan already adopted. Of course, the federal government will participate substantially in the project subsequent to the approval of the design plan, but participation alone is not enough. The real question is whether the government's continued participation constitutes *"further* major Federal actions having a significant effect on the environment." 36 Fed.Reg. 7727 (1971) (emphasis added). It can be persuasively argued that after final design approval, nothing *further* occurs which (1) is major and (2) has a significant effect on the environment, because no action outside the contemplation of the approved design is undertaken. Such an analysis is completely consistent with our previous holding in San Francisco Tomorrow v. Romney, 472 F.2d 1021, 1024–1026 (9th Cir. 1973).

TRASK, Circuit Judge, with whom Circuit Judges WRIGHT, CHOY and GOODWIN join (specially concurring):

Part 2 of the opinion discusses "Public Hearings" that have been held, including a design hearing by the Washington State Department of Highways on June 2–6, 1970. In part 2c the opinion acknowledges the contentions of the State Defendants-Appellants that this hearing did comply with section 128(a) as

amended, and that such hearing together with other meetings held by the Washington State Department of Highways with interested persons and groups constitutes substantial compliance with section 128(a) so that no further hearing should be required.

While the opinion leaves the question of the need for a further hearing to the District Court to consider on remand, it "suggests" that the District Court may feel "that the case can and should be disposed of more expeditiously by requiring a new hearing or opportunity for a hearing" of the type the opinion has discussed.

Lest the District Court might consider this language to constitute an admonition which would interfere with its freedom of decision, it should be pointed out that the record of the June 2–6, 1970, hearings has never been before us. None of us has examined it. No basis exists therefore upon which we can circumscribe the trial court's freedom of judgment in assessing the sufficiency of that record. The suggested admonition is predicated upon the fact that an appeal might be taken unless a new hearing is held. An appeal might also be taken if a new hearing is held. The evaluation of the sufficiency of the record to comply with the statutory requirements and regulations is for the trial court in the first instance. It should be exercised as in any other case without advice from this court as to the manner in which the decision should be made upon evidence we know nothing about.

CHAMBERS, Circuit Judge (concurring):

As a result of today's decision, the Secretary may no longer approve federal funding for any proposed federal aid highway project bypassing or going through a town or city unless the state has held a public hearing in compliance with 23 U.S.C. § 128(a), as amended. I concur in this result.

Section 128(a) itself requires the state to do nothing more than provide a structured forum for the public discussion of the possible social, environmental and economic impacts of a proposed highway location or design. On the other hand, the Secretary's regulations promulgated under § 128(a), in which we are now obliged to acquiesce, require the state to use that forum as a means of fully acquainting the public with such possible consequences.

Today's decision prescribes two sets of criteria for determining whether the state has met this requirement. First, the state must have furnished all information relevant to the considerations listed in 23 C.F.R. § 790.3(c)(1) through (c)(7). Because that list was not intended to be exclusive, we have decided that the state must also furnish any relevant information relating to those considerations normally contained in an Environmental Impact Statement, if those considerations are necessary to give the public a full acquaintance with the social, environmental and economic impacts of the proposal.

Anyone challenging the sufficiency of the information provided by the state has the burden of establishing that the information omitted was relevant to one of the prescribed considerations and that the information could reasonably have been expected to have had an impact on the decision making process. With this in mind, the district court is left to the task of determining whether the state complied with § 128(a), as amended.