Constance A. ADLER, Roosevelt Lathan
and Pearline Lathan, etc., et al.,
Plaintiffs/Appellants,

v.

Andrew LEWIS,* Secretary of Transpor-
tation, Defendants/Appellees.

No. 79–4645.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1980.

Decided April 30, 1982.

---

* Pursuant to Fed.Rule of App.Proc. 43(c)(1), we substitute the names Andrew Lewis, successor to the original appellee, Neil Goldschmidt, as the Secretary of the United States Department of Transportation, and Anne McGill Gorsuch, successor to the original appellee, Russell R. Train, Administrator of the Environmental Protection Agency.

Roger M. Leed, Seattle, Wash., argued, for plaintiffs/appellants; Michael W. Gendler, Seattle, Wash., on brief.

David M. Shell, Pacific Legal Foundation, Sacramento, Cal., for amicus curiae.

Robert B. Rutledge, Portland, Or., argued, for defendants/appellees; Charles F. Secrest, Olympia, Wash., on brief.

Before SNEED and ANDERSON, Circuit Judges, and EAST, District Judge.[***]

J. BLAINE ANDERSON, Circuit Judge:

The plaintiffs, numerous environmental organizations[1] and one private citizen,[2] appeal from the district court's judgment dissolving the injunction prohibiting acquisition of right-of-way for the proposed high-

[***] The Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

[1.] The organizations include: CARHT (Citizens Against R. H. Thompsen Freeway), Central Seattle Community Council Federation, Montlake Community Club, Ravenna Bryant Community Association, Mt. Baker Community Club, Les-

chi Improvement Council, Friends of the Earth, Inc., Washington Environmental Council, Madrona Community Council, Seattle Urban League, and the Metropolitan Democratic Club. See footnote 7 and accompanying text.

[2.] The one remaining individual plaintiff is Diane Halverson. See footnote 7.

way expansion by State and Federal defendants.[3]

This appeal involves yet another phase in the continuing saga concerning a corridor for Interstate Highway 90 (I–90) in the state of Washington between the cities of Seattle and Bellevue. The proposed facility consists of an eight-lane, limited access highway consisting of two three-lane roadways for the use of private motor vehicles and a two-lane center roadway devoted to the use of transit car pools and limited general traffic from Mercer Island. The project is 6.9 miles in length located between I–5 in Seattle and I–405 near Bellevue, and generally follows the alignment of the existing highway facility in the corridor. The new facility will incorporate a new tunnel immediately adjacent to the existing tunnel through Mt. Baker Ridge, require the construction of a new floating bridge adjacent to the existing floating bridge across Lake Washington, and will contain two extensive "lidded" sections in Seattle and Mercer Island. Access to and from the facility is provided by several interchanges throughout its length: to Interstate 5, the western terminus of the project, by a major interchange with the center lane ramp terminating at the existing South Dearborn Street, and at another major interchange at the project's eastern terminus, an already completed portion of I–90, tying the facility into Interstate 405, the major north-south highway facility east of Lake Washington.

## I. BACKGROUND

The facts pertinent to this appeal are here recited briefly, but for a complete understanding of this case's litigation, see *Lathan v. Volpe*, 455 F.2d 1111 (9th Cir. 1971), *Lathan I*, the district court opinion on remand, *Lathan v. Volpe*, 350 F.Supp. 262 (W.D.Wash.1972), and the second appeal to this court, *Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974), *Lathan II*.

This court, in *Lathan I*, reversed the trial court's denial of a preliminary injunction, holding, *inter alia* (1) that the State and Federal defendants were to prepare an environmental impact statement (EIS) for the project pursuant to the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321, *et seq.* (1970), and (2) that the displaced persons relocation plan prepared by defendants was insufficient to provide assurances of adequate housing to comply with the Uniform Relocation Act, 84 Statute 1894 (URA). An injunction was entered by the district court pursuant to this court's instruction, specifying that the defendants were enjoined from acquiring the right-of-way pending compliance with "applicable federal law." *Lathan I*, 455 F.2d at 1122.

Subsequently, a partial EIS was prepared (for the segment between I–5 in Seattle and Mercer Island—"Seattle Segment") and a new relocation plan. Following the ruling of the district court, this court in *Lathan II* affirmed, finding the Environmental Impact Statement (EIS) and § 4(f)[4] statements inadequate.[5] The *Lathan II* court, however, reversed a portion of the district court's decision and ordered that a new public hearing be held for the entire length of the I–90 project between I–5 and I–405, pursuant to 23 U.S.C. § 128. In

---

**3.** The original Federal defendants included Neil Goldschmidt, the United States Secretary of Transportation, and Russell R. Train, the Environmental Protection Agency Administrator. The district court entered a summary judgment dismissing the defendant EPA and all issues raised under the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.* prior to trial.

The original state defendants included William A. Bulley, the Secretary of the Washington Department of Transportation, and the Washington Transportation Commission (the authority within WDOT responsible ultimately for determining transportation policies of the State and approving State funding for all highway projects).

**4.** Section 4(f) refers to that section in the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1970). See subsequent discussion in part B of this opinion.

**5.** The Washington Department of Transportation (WDOT) supplied the *Lathan II* court, along with its briefs on appeal, a new draft EIS for the "Seattle Segment." The court in *Lathan II* declined to consider the adequacy of this document and remanded the matter to the district court.

addition, this court ordered that an EIS consistent with the requirements of NEPA was to be the basis of the public hearing, and continued the injunction pending compliance. No issue was raised regarding the district court's determination that the defendants had complied with the requirements of the URA based on the new relocation plan.

After *Lathan II*, WDOT prepared a new draft EIS covering the entire uncompleted portion of the I–90 project to serve as the basis for new public hearings under § 128(a). Three public hearings were held during January and February 1976. Following these hearings, it was clear that conflict existed regarding the size of the then ten-lane plan between the .State and local affected jurisdictions. In an effort to resolve those conflicts, negotiations were initiated between the State of Washington DoT and the cities of Seattle, Mercer Island, and Bellevue, King County, and METRO [6] concerning further project development. As a result of these negotiations, an interjurisdictional consensus was reached in December 1976. This Memorandum of Agreement (MOA) provided for an eight-lane plan, continued incorporation of all environmental protection measures which had previously been incorporated into the larger project, and an independent study to be undertaken of various "transit access" provisions at both termini of the I–90 project (Seattle on the West and Bellevue on the East), with the parties subsequently seeking Federal funds to finance the access project.

A Final EIS for the eight-lane project was prepared by WDOT and submitted to the Secretary of Transportation on April 12, 1977, including a separate report addressing the § 4(f) involvements of the project. Judge Thompson, Jr., following agreement by the parties, wrote to the Secretary of Transportation requesting a decision. September 7, 1978, the Secretary issued his § 4(f) findings in the "§ 4(f) Determination," that there were no feasible and prudent alternatives to the use of the § 4(f) lands and that the project included all planning to minimize harm to such § 4(f) lands.

Secretary Adams approved the project encompassing the entire uncompleted portion of the I–90 project between I–5 and the I–405 based upon the FEIS and "§ 4(f) Analysis" in his "Decision Document" dated September 20, 1978. The Final Environmental Impact/§ 4(f) Statement was approved and adopted by the Federal Highway Administration (FHWA) on September 22, 1978.

Defendants moved on October 3, 1978 to dissolve the injunction entered after *Lathan I* and requested the district court to enter an order establishing a schedule to control the course of future litigation in the consolidated cases.[7] The parties stipulated, notwithstanding other issues in the case, that WDOT should proceed with necessary safety improvements within the I–90 corridor, including removing the "bulge" in the Lacey V. Murrow floating bridge.

During the course of discovery proceedings, many parties plaintiff in the consolidated actions were dismissed.[8] The pretrial order framed issues under NEPA, Federal Aid Highway Act 23 U.S.C. §§ 128(a), 134(a), and 138, the Clean Air Act,[9] 42 U.S.C. § 1983, and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

Trial was to the court in June 1979. The parties submitted Proposed Findings of

---

**6.** METRO is the Municipality of Metropolitan Seattle, the public agency which operates the transit system in King County.

**7.** During the pendency of the appeal in *Lathan II*, a new action (*Adler v. Brinegar*) was filed seeking an injunction against the I–90 project, alleging the same violations of NEPA, § 4(f) and § 128(a), as in the *Lathan* case. On defendants' motion, the cases were consolidated for trial in the district court.

**8.** The plaintiffs were dismissed for failure to appear at depositions which the court had previously ordered them to attend. As a result, none of the original plaintiffs in the *Lathan* case remain (only the organizations included as plaintiffs/intervenors remain of the *Lathan* case) and only one individual plaintiff remains in the *Adler* case.

**9.** See footnote 3.

Fact and Conclusions of Law as the court requested. On August 27, 1979, the court entered its Judgment dissolving the injunction and ruling for the defendants, based upon its Findings of Fact and Conclusions of Law dated August 22, 1979.

## II. DISCUSSION

### A. District Court Duty to Take a "Hard Look"

■ We summarily dispose of appellants' assertion that the district court erred in "mechanically" adopting findings of fact and conclusions of law. There is virtually nothing in this record to support the bald assertion. The evidence is, however, that the court studied the findings and conclusions submitted by both parties and that some were completely rewritten or substantially modified. The principles we apply are well established and we see no need to reiterate them once again. *See, Hagans v. Andrus*, 651 F.2d 622 (9th Cir.), *cert. denied, Hagans v. Watt*, —— U.S. ——, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); *Mayview v. Rodstein*, 620 F.2d 1347 (9th Cir. 1980); *Westside Property Owners v. Schlesinger*, 597 F.2d 1214 (9th Cir. 1979); and *Photo Electronics Corp. v. England*, 581 F.2d 772 (9th Cir. 1978).

Appellants' argument that the district court did not conduct an objective review is based upon a letter by the court to the federal Secretary of Transportation. Appellants contend the court had a "personal commitment to seeing the project through to completion, . . . [the judge had] made [a] personal written plea to Secretary Adams, urging him to expedite required approvals. . . ." Brief of Appellants at 13.

From our analysis, there is nothing in the record to indicate the trial court acted with bias toward the defendants and their program. (RT 734). The judge remarked that he had written to the Secretary, requesting him "to approve this thing or not approve it, or at least make a decision on it . . ." (RT 734). The bold assertions of one-sidedness by appellants are not supported by the record.

The appellants also contend the district court failed to independently review the appellees' administrative actions by ignoring central issues and excluding relevant evidence. These assertions relate to the adequacy of the EIS and the section 4(f) statement, and will be considered within the discussions of these issues, respectively.

### B. 4(f) Determination

Appellants raise several questions pertaining to the Secretary of Transportation's compliance with the Department of Transportation Act of 1966, § 4(f), 49 U.S.C. § 1653(f) (1970). The national policy, announced in § 4(f) and in identical language of § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138 (1970), is to take "special effort . . . to preserve the natural beauty of the countryside and public parks and recreation lands. . . ." Section 4(f) provides:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational

area, wildlife and waterfowl refuge, or historic site resulting from such use." 49 U.S.C. § 1653(f).[10]

■ The issues raised by appellants parallel the questions involved in judicial review as announced by the Supreme Court in the leading case, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In discussing § 4(f), the Court rejected both the substantial evidence test and the *de novo* review of whether the decision was "unwarranted by the facts." Though the Secretary's decision is entitled to a presumption of regularity, the reviewing court still engages in a substantial inquiry because the presumption does not "shield his action from a thorough, probing, in-depth review." 401 U.S. at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153.

■ The opinion enunciates three questions for the reviewing court to consider. First, the court must examine whether the Secretary acted within the scope of his authority. Analyzing this facet of the review, the court must determine if, on the facts, the Secretary's decision can reasonably be said to be within the small range of choices Congress specified, and whether the Secretary could have reasonably believed in that particular case there were no feasible and prudent alternatives, or that the alternatives involved unique problems. 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 153. The Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V) requires the determination actually made not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" to avoid being set aside by the reviewing court. Second, in examining the decision, the reviewing court must evaluate whether "the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–4, 28 L.Ed.2d at 153. The third and final inquiry is whether the Secretary's action followed the necessary procedural requirements.

Appellants have not voiced any objection to the Secretary's compliance with procedural requirements. Instead, the issues presented are: (1) whether the Secretary relied on improper considerations in his § 4(f) determination, (2) the correctness of the conclusion that there were no feasible and prudent alternatives, and (3) whether there was a failure to incorporate all possible planning measures to minimize harm.

### 1. Application

Section 4(f) is triggered only when the Secretary of Transportation is asked to approve a transportation program or project seeking to employ federal funds, which requires the "use" of land from a public park, recreation area, wildlife or waterfowl refuge, or from an historic site. The labeling of property as "used" or "not used" is the prerequisite to further examination and to compliance with the provisions of § 4(f).

This phase of § 4(f) was not discussed by the Court in *Overton Park*. It was not disputed that the highway, slated to dissect Overton Park by separating the zoo from the rest of the park, would be a "use" within the meaning of the statute; it was acknowledged. Here, the assertion is the Secretary incorrectly concluded that, of the 50 potential sites, 29 were "not used," and, as a result, failed to examine § 4(f)'s two requirements with respect to those sites. Appellants argue some of these 29 sites are *closer* to the project than the site classified as used in *Stop H–3 Association v. Coleman*, 533 F.2d 434 (9th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976).

Though correct in discussing *Stop H–3* for the interpretation of "use," appellants do not correctly characterize the opinion as emphasizing the proximity between the project and the threatened site as the crucial factor. This court discussed the geographic closeness of Pohaku Ka Luahine (the protected site, a petroglyph rock) to H–3 (the proposed highway), not merely in terms of distance, but rather its utility or importance as a site would be impaired by

10. For a thorough discussion of § 4(f), including legislative history, see Gray, *Section 4(f) of* the Department of Transportation Act, 32 Md. L.Rev. 326 (1973).

the highway's location, and hence was "used." Similarly, in *Brooks v. Volpe*, 460 F.2d 1193 (9th Cir. 1972), the court found a campground to be used, within the meaning of § 4(f), when encircled by the proposed highway project. There would be an adverse impact on the campground from the highway since its isolation would be interrupted.

■ The term "use" is to be construed broadly, not limited to the concept of a physical taking, but includes areas that are significantly, adversely affected by the project. Department of Transportation Order No. 5610.1A, para. 9(c)(1), 36 Fed.Reg. 23681 (1971). Even off-site activities are governed by § 4(f) if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of its prior significance and enjoyment. *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir. 1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

■ The importance of this analysis is obvious since absent a determination of "use," the section's provisions do not apply. An analogy can be drawn between this classification and the initial determination that a project is one which "significantly affects the quality of the human environment" involving preparation of an environmental impact statement (EIS) as per the National Environmental Policy Act of 1969 (NEPA), § 102(2)(c), 42 U.S.C. § 4322(2)(c) (1970).

The threshold test requiring preparation of NEPA's impact statement is met when a plaintiff alleges "facts which, if true, show that the proposed project would materially degrade any aspect of environmental quality." *Environmental Defense Fund v. Armstrong*, 487 F.2d 814, 817, n.5 (9th Cir. 1973), *cert. denied*, 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974), *overruled on other grounds, Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552, n.3 (9th Cir. 1977).

### 2. Secretary's Determination

■ This court, in reviewing the Secretary's decision, "must satisfy itself that the Secretary evaluated the highway project with the mandate of § 4(f) clearly in mind." *Stop H–3*, 533 F.2d at 445; *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 154. The combined Final Environmental Impact/Section 4(f) Statement [11] recites the standard applied here for determining use:

> "A site is considered 'used' whenever land from or buildings on the site are taken by the proposed project, or whenever the proposed project has significant adverse air, water, noise, land, accessibility, aesthetic, or other environmental impacts on or around the site, as per the *Stop H–3 Association v. Coleman* [opinion]."

FEIS, vol. IV at 4.

Using this standard,[12] the Secretary concluded that of the 50 potential § 4(f) sites, only 18 were used.[13] The FEIS/§ 4(f) doc-

**11.** Hereinafter, "§ 4(f) Analysis," Volume IV: Environmental Analysis for 4(f) Determination.

**12.** It is not evident from the "§ 4(f) Determination" (see *infra*, note 13) nor the Decision Paper on I–90, Seattle, Washington, by the Secretary of Transportation, September 20, 1978, what standard the Secretary applied, though we presume he applied a correct standard until the contrary is proven. The Secretary cites to the FEIS/§ 4(f) Analysis in his "§ 4(f) Determination" which further supports the conclusion he applied the standard there enunciated.

It must be noted, the Decision Paper on I–90 (hereinafter "Decision Document") includes discussion of both § 4(f) and NEPA. As a result of this overlap, we look more closely at the "§ 4(f) Analysis" and the "§ 4(f) Determination" for resolution of the § 4(f) issues.

**13.** Department of Transportation, Federal Highway Administration Section 4(f) Determination, King County, Washington, Interstate Route 90 Freeway [September 7, 1978] (hereinafter "§ 4(f) Determination," approved the project and found no feasible and prudent alternative to the use of certain land. This thirteen-page document further excludes from the conclusion of use, five sites that the Environmental Analysis for 4(f) Determination, vol. IV of the Final Envir. Impact/Section 4(f) Statement had included as used. FEIS, vol. IV at 161–163 (hereinafter, "§ 4(f) Analysis").

The Secretary concluded that the proposed I–90 project would use: Sturgus Park, Judkins Playground, Luther Burbank Park, Lake Washington, Lacey V. Murrow Memorial Bridge and Plaza, Laurence J. Colman Elementary School and Playground, Colman Playground and Play-

ument was used as a basis for the Secretary's decision; we examine it to determine if consideration was given according to § 4(f) mandates. Appellants' argument that the Secretary incorrectly determined that only 21 of the 50 sites were "used," is not supported by references to the record of particular sites that should have been classified as adversely affected, i.e., "used." We independently found the differences in the number of sites discussed in these documents, but believe the failure to specifically discuss the four sites in the "§ 4(f) Determination" and in the Secretary's "Decision Document" is not significant nor dispositive. All 50 sites, "used" and "unused," were thoroughly investigated during this long and tedious process. All sites are treated extensively in the "§ 4(f) Analysis."

We read all three documents together as no one of them alone, fully satisfies the commands of § 4(f). As noted above, the "§ 4(f) Analysis" provides the standard the Secretary applied in determining "use," the "§ 4(f) Determination" cites alternatives considered, the conclusion that there is no feasible and prudent alternative to the use of 18 sites, and recites efforts to minimize harm. The "Decision Document" records the decision of the Secretary that no alternatives are feasible and prudent to "the use of the parks and historic sites required for the project, and that all possible planning to minimize harm to the affected areas has taken place," and his "decision to approve construction of I–90 as proposed by the Washington State Department of Transportation." *Id.*, "Decision Document," at 5 and 1, respectively.

We first examine the "use" classification applying the *Overton Park* analysis and then the Secretary's § 4(f) conclusion by the same standard. Looking to the scope of the Secretary's authority, any conclusion

utilizing an appropriate standard relative to the 50 sites would satisfy the first segment as being within the "small range of choices the Secretary could make." The second part of the question concerning the Secretary's authority encompasses whether he could have reasonably believed that only 18 of the 50 were used. Attention is given in the "§ 4(f) Analysis" to all 50 sites, detailing possible environmental effects from this project. This section appears reasonably complete, discussing such factors as noise, air quality, aesthetics, access and more.

The Secretary, in his "Decision Document," states in part, "In making my decision, I have before me the EIS, including the submission pursuant to section 4(f), and other elements of the administrative record." "Decision Document," p. 3. He lists several other reports he has reviewed in making his decision. The Secretary concludes the paragraph, "I have considered both the adverse and beneficial impacts of alternatives and the measures which will be taken to minimize the adverse impacts."

The district court found the Secretary could have reasonably believed that less than the 50 sites were used. We agree. These findings are not clearly erroneous. The Secretary determined "use" based on the studies before him, which considered relevant facts concerning environmental impacts.

■ Moving to the Secretary's "§ 4(f) Determination," relative to the alternatives to using the 18 sites, we review it under the same standard, *Overton Park*. The Supreme Court clarified the meaning attached to "feasible and prudent alternatives." Recognizing that "feasible" allows for little administrative discretion, the Court considered it to mean, as a matter of "sound

---

ground Building, Our Lady of Mount Virgin Church, LaTurner House, Mount Baker Ridge Tunnels, Residence at 1371 31st Avenue South, Apartment House at 2415 S. Irving Street, Residence at 2231 60th Avenue Southeast, Jeffrey Martine House, and the Residences at 8107 and 8115 Southeast 28th Street.

The Secretary excluded Jose' Rizal Park, Lincoln Landing Park, Sweyolocken Park, Resi-

dence at 1323 Hiawatha Place South and the Residence at 1409 Lakeside Avenue South.

Both the district court and the appellants discuss the figure involving use as "21"—though the number found in vol. IV of the Final Envir. Impact/Section 4(f) Statement is 23 (the last site includes 2 residences).

engineering it would not be feasible to build the highway along any other route." *Overton Park*, 401 U.S. at 411, 91 S.Ct. 821, 28 L.Ed.2d 150, citing 114 Cong.Rec. 19915 (1968) (statement by Rep. Holified.) Whether alternative, feasible routes would be "prudent" was not intended to focus on cost and community disruption unless the results reached "extraordinary magnitudes" or was not prudent because there were "truly unusual factors present in a particular case." *Overton Park*, 401 U.S. at 413, 91 S.Ct. at 822, 28 L.Ed.2d at 151.

The Secretary concluded that there was no feasible and prudent alternative to the use of the 18 sites. Appellants argue he based his decision on irrelevant factors and an inadequate and outdated "§ 4(f) Analysis." Appellees assert the Secretary's conclusion is properly based on findings of fact not clearly erroneous, including (1) other alternatives would still require "use" of § 4(f) lands, (2) other corridors would cause severe community disruption, (3) design alternatives involve their own § 4(f) involvement and would not serve the function of the project, and (4) even the no-build alternative would perpetuate congestion.[14]

Though most alternatives appear to deal with the composite project, the "§ 4(f) Determination" states, "the alternatives discussed here are generally common to all or to a number of the § 4(f) lands associated with the proposed project." "§ 4(f) Determination" at 1. The Secretary's decision is entitled to a presumption of regularity. Absent argument by appellants pointing to the record and demonstrating with specificity the alleged errors of judgment or irrelevant factors that formed the basis for his decision, we are not inclined to make their case for them. Even if the decision of the Secretary be different from the one this court would make if it were our responsibility to choose, we will not substitute our judgment for that of the Secretary. We have not been directed to any portion in the record demonstrating an erroneous decision and, as a result, find no grounds to disturb the Secretary's conclusion that there are no feasible and prudent alternatives to the use of such § 4(f) lands.[15]

Once the Secretary determines that § 4(f) lands will be adversely impacted and finds there are no feasible and prudent alternatives to such use, he must address the final portion of § 4(f) which requires a finding that "such program includes all possible planning to minimize harm to such park . . . resulting from such use." 49 U.S.C. § 1653(f)(2). Appellants assert § 4(f) requires all measures "technically possible . . . be implemented" if there is no feasible and prudent alternative to the use of protected lands. This statement goes beyond where this court is willing to venture and is not required by the Act nor existing precedent.

Other circuits, in addressing this question, have said that implied within the statement "all measures," is the condition that such efforts to minimize harm be feasible and prudent, or reasonable. *Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79, 86 (5th Cir. 1976); *Citizens to Preserve Overton Park v. Volpe*, 335 F.Supp. 873, 883 (W.D.Tenn.1972) (§ 4(f) requires "all reasonably possible planning"). *See generally, D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir. 1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); and *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 700–701 (2d Cir. 1972). Such a reading fully considers the practicalities involved and yet maintains the strict command of the section's language. *Monroe County* characterizes the section as creating an "affirmative duty" to minimize the damage to parkland as:

---

**14.** Appellees assert appellants' concern over irrelevant factors is confused because their support for the position comes from the "Decision Document" rather than the "§ 4(f) Determination."

**15.** This opinion should not be read broadly as commending the method of discussing alterna-

tives employed here, but rather as a statement relating to the function of the appellate process and the responsibilities of the participants thereto. Absent support, bold assertions that factors considered were not truly unusual and therefore did not justify a conclusion of non-prudence, warrant little attention.

"[a] condition precedent to approv[ing] such a taking for highway purposes where federal lands are involved; and the Secretary must withhold his approval unless and until he is satisfied ... full implementation of such planning ... is an obligated condition of the project."

*Id.*, 472 F.2d at 701.

This second phase of § 4(f) is discussed by the District of Columbia Circuit which concludes it involves far more than merely calculating the number of acres to be asphalted. *D.C. Federation*, 459 F.2d 1231. The Court emphasized, "the location of the affected acres in relation to the remainder of the parkland may be a more important determination than the number of acres affected." *Id.*, 459 F.2d at 1239.

It is also important to note the bifurcated analysis of the two considerations of § 4(f). The Fifth Circuit has discussed the completely unconnected nature of the two § 4(f) considerations:

"[t]he significant difference between ... subsections (1) and (2) assays is that considerations which might make an alternate imprudent (such as displacement of persons or businesses or a Title 6 problem) are simply *not* relevant to determining whether a different path would minimize harm to the [value of the protected lands]."

*Louisiana Environmental Society*, 537 F.2d at 86. Inquiry under subsection (2) of § 4(f) requires a balancing of the harm to the site by the proposed project, with the harm to the same site by another alternative or a plan to implement mechanisms to diminish that particular harm.

There may be, as appellants assert, some "technical" deficiencies or some actions may not be "technically" correct (the four sites discussed in the "§ 4(f) Analysis" yet not discussed in the Secretary's final decision). However, even under the exacting § 4(f) requirements, the judicial branch may not "fly speck," if it appears, in its review, that all factors and standards were considered. Whether or not the reports and studies use the "magic" terminology, there has been a reasonable and thorough review of a voluminous record accumulated over a span greater than ten years, which includes extensive public contribution.

Substitution of the 180-acre greenbelt is important here as a measure to minimize harm, though it is not per se dispositive of compliance with the second prong of § 4(f). Even with some of the deficiencies pointed out by the appellants, considering the entire plan and the record as a whole, we are of the opinion that § 4(f) standards have been satisfied.

When considering all other alternatives, i.e., the conceptual ones, no-build, nonstructural, corridors north or south, design alternatives, rail transit and safety improvements, as the Secretary did, the conclusion is there has been reasonable compliance, even with the minor deficiencies pressed by appellants. There is a foundation in the record for the reasonable belief that no feasible and prudent alternatives exist and that all possible planning to minimize harm has been undertaken. The district court so found and we agree.

As to several areas of the project, the Secretary's approval was conditional. We are satisfied the project will proceed subject to those conditions. The Secretary and the agencies, both Federal and State, have complied with the prior directives of this court in *Lathan I* and *II*, and the mandates of § 4(f).

## C. NEPA Issues

The third argument appellants raise before this court involves the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321, *et seq.* (hereinafter NEPA). NEPA requires the preparation of an environmental impact statement (EIS) under § 102(2)(c), when a federal agency recommends "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(c). One purpose of the EIS is to "provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the

project in light of its environmental consequences." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (9th Cir. 1974). In addition, preparation "provide[s] the public with information on the environmental impact of a proposed project, as well as encourage[s] public participation in the development of that information." *Id.*

### 1. Standard of Review

▉ The appropriate standard for review of the adequacy of an EIS is well established in this circuit as that set forth in § 706(2)(D) of the Administrative Procedure Act: whether the EIS was prepared "without observance of procedure required by law." 5 U.S.C. § 706(2)(D) (1976). *See Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 781 (9th Cir. 1980); *Trout Unlimited v. Morton*, 509 F.2d at 1282; *Lathan II*, 506 F.2d at 692–3. The determination of adequacy is essentially pragmatic. *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir. 1977) (*per curiam*). Whether an EIS will be found in compliance with NEPA involves an evaluation of whether the discussion of environmental impacts "reasonably set[s] forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision." *Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1217 (9th Cir. 1979). *See Columbia Basin Land Protection Assn. v. Schlesinger*, 643 F.2d 585, 592 (9th Cir. 1981); *Coalition for Canyon Preservation*, 632 F.2d at 782; *Trout Unlimited*, 509 F.2d at 1283. Preparing an EIS requires the exercise of judgment; however, a court in its review may not substitute its judgment, but instead is limited to ensuring that the *agency* has considered the environmental consequences of its action. *Strycker's Bay Neighborhood Council, Inc. v. Karlen, et al.*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *Lathan II*, 506 F.2d at 693.

▉ We note initially, compliance with one environmental statute does not assure compliance with another. In *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851 (9th Cir. 1982), we discussed the commands found in the National Historic Preservation Act, 16 U.S.C. §§ 470, *et seq.*, and those in NEPA. In the case of historic buildings, each statute "mandates separate and distinct procedures, both of which must be complied with . . . ." *Id.* at 859. Similarly, a finding of compliance or noncompliance with § 4(f) of the Department of Transportation Act does not mandate the identical conclusion as to NEPA provisions.

### 2. Public Hearing

▉ Appellants raise five subissues concerning NEPA compliance. We summarily reject their first argument that the public hearing was inadequate since not conducted with an "approved, final EIS." This court, in *Lathan II*, did not direct such a document to be the basis of a new hearing. Circulation of even a deficient draft EIS may be sufficient so long as it does not frustrate the goal of obtaining informed agency and public comment. *National Wildlife Federation v. Adams*, 629 F.2d 587 (9th Cir. 1980); *Lathan II*, 506 F.2d at 693. *See also, Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1022–1023 (9th Cir. 1980). Regulations require the draft EIS to be circulated to enable informed comments at the public hearing. 23 CFR § 177.12.[16]

### 3. Segmentation

Appellants argue in their next subissue that the proposed project did not involve an "adequate highway segment." The leading case in this circuit is *Daly v. Volpe*, 514 F.2d 1106 (9th Cir. 1975), which set forth criteria that, when found, demonstrated the portion was suitable for consideration in an EIS for that highway segment. The four considerations are: (1) the section must be as long as practicable to permit consideration of environmental matters on a broad scope, (2) the section must have independent utility, (3) the length of the highway selected must

---

16. Additionally, the definition of a final EIS under 23 CFR § 771.3 states it is the same as the draft EIS, but includes "appropriate revi-sions to reflect comments received from circulation of the draft EIS and the public hearing process."

assure an adequate opportunity for the consideration of alternatives, and (4) the segment should fulfill important state and local needs. *Id.* at 1109–1111; *Lange v. Brinegar*, 625 F.2d 812 (9th Cir. 1980).

In determining whether there was sufficient evidence to establish compliance with NEPA for the segment, we are bound by the findings of the trial court unless they are clearly erroneous. *Id.* at 815; *Sessions, Inc. v. Morton*, 491 F.2d 854, 858 (9th Cir. 1974). Appellants question only the first two criteria. We have examined the record, including the Findings of Fact and Conclusions of Law made by Judge Thompson. An adequate discussion of the *Daly* criteria is found, including that the termini of the project are both major cross-roads (I–5 and I–405) and population centers (Seattle and the City of Bellevue). The court found the project would be able to serve its purposes without the construction of additional facilities, and that there were no pending proposals for major federal action regarding related projects. The Connecticut Street Viaduct had not reached the stage of a "project" and hence did not require the preparation of an EIS. In *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court stated the mere contemplation of future action was not sufficient to require preparation of an EIS. In this case, the EIS covered an adequate highway segment.

### 4. Alternatives

Appellants assert the state defendants failed to develop alternatives and thereby violated NEPA. Section 4332(2)(C)(iii) requires alternatives to the proposed action be included in the EIS. However, this court has held the alternatives discussion to be subject to "reasonableness." *Life of Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied,*

416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The three alternatives complained of by the appellants are discussed by the trial court. The withdrawal and substitution alternatives are considered in the FEIS in six variations. In addition, two studies discussing this option are incorporated in the technical appendix. It is further evident that the local jurisdictions (Seattle, Bellevue, Mercer Island and King County) unanimously voted *not* to withdraw and substitute the funds elsewhere. Neither the Mayor's second alternative nor the interim High Occupancy Vehicle study aid appellants' argument. The Mayor's 2–2–2 alternative was merely a variant of another fully discussed alternative which *Brooks v. Coleman*, 518 F.2d 17, 19 (9th Cir. 1975), concludes does not have to be addressed. The interim HOV study was not an alternative to the project, but rather improvements to occur before construction begins. We find the range of alternatives considered was sufficient to permit a reasoned choice, and complies with NEPA as the trial court found. Appellants have not shown the district court was clearly erroneous in its determination that the discussion of alternatives in the EIS was reasonable. *See Vermont Yankee Nuclear Power Corporation v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Daly*, 514 F.2d at 1111.

### 5. Planning Data Base

Appellants' fourth subissue is that the transportation plan developed pursuant to 23 U.S.C. § 134[17] was not based on correct and accurate data. It is recognized that administrative consideration of evidence creates gaps between the time the record is closed and the decision is made. *Vermont Yankee*, 435 U.S. at 555, 98 S.Ct. at 1217, 55 L.Ed.2d at 486. There is an end "to the period during which an agency must reopen

---

**17.** 23 U.S.C. § 134 provides that proposed projects should be "based on a continuing comprehensive transportation planning process carried on cooperatively" by the State and local communities in the area, and that proposed projects take due consideration of their social, economic and environmental effects.

Though this section is not part of NEPA, appellants bring the two together by asserting the inadequate transportation plan data was used in the EIS, though more current and accurate data was available.

the record to consider new facts." *Nance v. Environmental Protection Agency*, 645 F.2d 701, 708 (9th Cir.), *cert. denied, sub nom. Crow Tribe of Indians v. E.P.A.*, —— U.S. ——, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). The standard applied regards administrative action as being "judged by the information then available to it." *Vermont Yankee*, 435 U.S. at 553, 98 S.Ct. at 1216, 55 L.Ed.2d at 485.

In *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275 (9th Cir. 1973), we stated that even if a study contained information relating to environmental effects which would be of assistance to those commenting on an EIS, the mere fact that it is not included "is not enough to sustain a finding that the Secretary violated NEPA by acting prior to the issuance of the study." *Id.* at 1281. In evaluating whether the EIS should have been delayed to await the new study, the factors to consider are: (1) the consequences of delay, (2) the present state of information relative to environmental factors, and (3) the relevance and degree of probative value of the information. *Id.*

The trial court found the demographic data unavailable, considered the above-mentioned factors, and concluded the preliminary information would not have significantly altered the conclusions already in the FEIS. We agree. We do not view this case as one requiring the reopening of the decision-making process to review later available data.

### 6. Impacts

Appellants' final subissue involving NEPA concerns the adequacy of the discussion of impacts in the EIS. Under this heading, appellants object in five areas because they believe the impacts were "inadequately discussed." What is required of an EIS is "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Trout Unlimited*, 509 F.2d at 1283. When the question is the adequacy of the consideration, we examine to determine whether consideration of those factors was "arbitrary or capricious." *Nance*, 645 F.2d at 712.

We have examined the EIS and conclude, as did the trial court, that the impacts of the project on city traffic, air quality, noise, aesthetics, and the social and economic effects were adequately considered. The issue of relocation housing was the subject of a stipulation between the parties and will not be addressed here. The EIS analyzes the effects of increased noise, including a chart demonstrating an increase in 10 decibels is perceived to be twice as loud as the sound if reduced 10 decibels.

Appellants argue the EIS is inadequate because it "ignored" three other impacts: energy consumption, effects of locating a ventilation facility in a residential neighborhood, and impacts on drivers using the project. The FEIS discusses the anticipated increases in both fuel, gasoline and diesel, and electricity from the construction and operation of the subject project. Appellants have failed to direct us to impacts, both significant and probable, to result from the project that render the EIS inadequate. The FEIS before us identifies and discusses the significant environmental impacts in sufficient detail and we agree with the conclusion of the district court, NEPA has been satisfied.

### D. § 1983

Appellants' final argument is that the district court erred in dismissing their claim for relief under 42 U.S.C. § 1983. The district court is correct in remarking that defendant State officials must be sued in their individual capacity in an action for monetary damages. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). We have not found, in reviewing the record and pleadings, a request for relief in the form of damages. Nonetheless, the trial court's dismissal can be upheld. Following our independent review, we find there is neither a basis in the arguments of the appellants nor in the record to support a § 1983 claim.

### III. CONCLUSION

We have reviewed the action of the district court which, following a "hard look" at

the record, dissolved the injunction. We find that action proper and further affirm the findings that the stringent § 4(f) standards and the procedures of NEPA have been satisfied by the appellees. In addition, appellants' claim for relief under § 1983 was appropriately dismissed.

AFFIRMED.

SNEED, Circuit Judge, Concurring:

I concur in the majority opinion, save for section II.B. With respect to it I concur in its result and add these observations.

## I.

Under section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1970), the Secretary of Transportation, as Judge Anderson points out, may not approve any highway project which *uses* parkland unless (1) there is no feasible and prudent alternative to the use of such land, and (2) the project includes all possible planning to minimize harm to the park resulting from its use. A project which does not take parkland by condemnation nonetheless may "use" the park, provided the proximity of the project to the park impairs its value in terms of its prior significance and enjoyment. *Stop H–3 Association v. Coleman*, 533 F.2d 434 (9th Cir. 1976) (Hawaiian stone monument with religious significance); *Brooks v. Volpe*, 460 F.2d 1193 (9th Cir. 1972) (alpine campground encircled by highway); *D. C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir.1971) (parkland under bridge over Potomac). Application of section 4(f), therefore, requires a three-part test:

(1) Does the project use (either by actually taking or by impairing the significance and enjoyment of) a public park?

(2) Is there a feasible and prudent alternative to such use (typically, not building the highway or choosing a different route)? [1]

(3) If there are no reasonable and prudent alternatives, does the project include all possible planning to minimize harm?

## II.

## APPLICATION TO I–90 SEATTLE–BELLEVUE CORRIDOR

The Secretary here complied with the requirements of section 4(f). The Secretary's "4(f) Analysis" properly determined that more than twenty of the fifty potentially protected sites would be "used" by the proposed highway. The Secretary's "4(f) Determination," when considered in conjunction with the planned "greenbelt," adequately established that no feasible and prudent alternative to the proposed corridor exists, and that the project includes all possible planning to minimize harm to affected parkland.

Although a small number of the more than twenty sites listed as "used" in the "4(f) Analysis" are not discussed in the "4(f) Determination," [2] the final Environmental Impact Statement, dated March 9, 1978, does in fact consider these sites rather exhaustively, and indicates that planning to minimize harm to them took place. The admonition that we must avoid "fly-specking" environmental impact statements, *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc); *Isle of Hope Historical Association, Inc. v. United States Army*

---

1. This prong gives section 4(f) teeth. An alternative is "feasible" unless "as a matter of sound engineering it would not be feasible to build the highway along any other route." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). A route is "prudent," despite greater economic costs or community disruption, unless the costs or disruption reach "extraordinary magnitudes" or there are "truly unusual factors" present in a particular case. *See id.* at 413, 91 S.Ct. at 822.

The reason that *Overton Park* makes it so difficult to uphold a finding that no "feasible and prudent alternative" exists is explained therein. Under usual circumstances, building a highway through a park will *always* be the least disruptive and cheapest route for the government. The purpose of section 4(f) is to protect parkland from highway use *in spite of* the "reasonableness" of such use in the absence of the statute. *Id.* at 411–13, 91 S.Ct. at 821–22.

2. *See* note 13 *supra* (majority opinion).

*Corps of Engineers,* 646 F.2d 215, 220 (5th Cir. 1981); *Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 611 (9th Cir. 1981) (dissent); *Citizens for Mass Transit, Inc. v. Adams,* 630 F.2d 309, 313 (5th Cir. 1980), is also appropriate in this context. While the decision makers conducting the 4(f) review might have organized their analysis in a better manner, the documentation read as a whole requires that we affirm.

The conclusion that all possible planning to minimize harm has been undertaken is strengthened by the fact that affirmative actions to enhance the project environmentally constitute a prominent feature of the project. The size, topography, and measures for revegetation incorporated in the planned greenbelt will greatly mitigate the loss of parkland from the project. Together with other planning incorporated in the section 4(f) documentation, the conclusion that all possible planning to minimize harm is proper. Section 4(f) has been satisfied.