SIERRA CLUB, the Wilderness Society, the Desert Protective Council, and California Native Plant Society, Plaintiffs/Appellants,

v.

William P. CLARK, Secretary of the Interior, Robert F. Burford, Edward Hastey, Gerald E. Hillier, William T. Civish, Everall G. Hayes, and Sports Committee District 37 AMA Inc., Defendants/Appellees.

No. 84–6483.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1985.

Decided Oct. 25, 1985.

Michael R. Sherwood, Deborah S. Reames, San Francisco, Cal., for plaintiffs/appellants.

Robert C. Bonner, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., James R. Arnold, Ronald K. Silver, Los Angeles, Cal., for defendants/appellees.

David Elson, David A. Juhnke, Manatt, Phelps, Rothenberg & Tunney, Los Angeles, Cal., for Dist. 37, A.M.A., Inc.

Before ANDERSON and TANG, Circuit Judges, and LEAVY,* District Judge.

J. BLAINE ANDERSON, Circuit Judge.

The Sierra Club and other environmental groups (Sierra Club) brought this action challenging the validity of two related but separate actions taken by the federal defendants on the grounds that they violated the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701, *et seq.*, (1982) and numerous other statutes, Executive Orders and regulations. The district court denied the requested declaratory and injunctive relief, and Sierra Club appeals. We affirm.

## BACKGROUND

Each Thanksgiving weekend from 1967 through 1974, an off-road motorcycle race was run from Barstow, California to Las Vegas, Nevada across public lands managed by the federal Bureau of Land Management (BLM). Based on studies conducted following the 1974 race which documented adverse impacts to desert resources, the BLM refused to issue a permit for the event in 1975. Permit applications were subsequently denied for each year thereafter, until 1983. According to BLM,

* The Honorable Edward Leavy, United States District Judge, District of Oregon, sitting by designation.

the latter permits were denied due to inadequate budgetary and personnel resources necessary to adequately study the environmental impacts and to develop appropriate mitigating measures to reduce those impacts.

By 1974, the Barstow to Vegas race had become relatively popular, drawing thousands of racers each year. When the permits were denied beginning in 1975, Thanksgiving weekend became the time each year for a "protest" ride over various routes of the old Barstow to Vegas course. These "protest" rides were not sanctioned by BLM, nor were they organized or supervised by any recognized clubs or organizations. The "protest" rides and attending activities resulted in considerable impacts on the biological, geological, cultural and other resources of the desert environment.

For various reasons, and largely aided by additional funding provided by defendant District 37, BLM began to study the prospect of permitting a Barstow to Vegas race in 1983. Before this could be done, however, the California Desert Conservation Area (CDCA) Management Plan had to be amended so as to designate a race course and race specifications. The CDCA contains approximately 25 million acres, which Congress mandated BLM to manage for multiple uses. The CDCA Management Plan was prepared, pursuant to § 601 of FLPMA, 43 U.S.C. § 1781, by BLM to "provide for the immediate and future protection of and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." 43 U.S.C. § 1781(b).

The amendment which designated the Barstow to Vegas course across the CDCA was entitled Amendment No. 6. The proposed course covered 110 miles and approximately 2000 acres, and was the subject of a Draft Environmental Impact Statement (DEIS) and a Final Environmental Impact Statement (FEIS). Included in Amendment No. 6 were specific mitigation measures to be implemented in order to reduce the im-

pacts a race might have on the course. In addition, it was provided that further mitigation measures could be added pursuant to new information, gathered data and monitoring results. Amendment No. 6 received final approval in May, 1983, a permit was issued in August, 1983, and the Barstow to Vegas race was held later in the year.

Sierra Club sued to challenge the validity of Amendment No. 6 and to enjoin the issuance of a permit for the 1983 race. Following a trial, the district court concluded that Sierra Club had failed to meet its burden of demonstrating that Amendment No. 6 was arbitrary, capricious, an abuse of discretion, or that it violated any of the relevant statutory provisions. We agree.

## DISCUSSION

### A. *Standard of Review*

■■■ Traditionally, an agency's interpretation of its own regulations is entitled to a high degree of deference. *Hawaiian Electric Co. v. United States EPA*, 723 F.2d 1440, 1447 (9th Cir.1984). The scope of review of an agency's factual findings is very narrow and they are "overturned only if arbitrary and capricious." *Sierra Club v. Clark*, 756 F.2d 686, 691 (9th Cir.1985); 5 U.S.C. § 706(2)(A) (1982).

### B. *Section 603(c) of FLPMA: Wilderness Lands Preservation*

Section 603(a) of the FLPMA, 43 U.S.C. § 1782(a), provides for the designation, within 15 years of October, 1976, of public lands suitable for preservation as wilderness. Section 603(c) further provides:

> During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner *so as not to impair* the suitability of such areas for preservation as wilderness....

43 U.S.C. § 1782(c) (emphasis added).

The BLM's "Interim Management Policy and Guidelines for Lands under Wilderness

Review," (IMP) provides that, under 603(c)'s non-impairment criteria, impacts caused by any permitted activity "must, at a minimum, be capable of being reclaimed to a condition substantially unnoticeable in the wilderness area ... *as a whole* by the time the Secretary of the Interior is scheduled to send his recommendation to the President." (emphasis added). The IMP also permits organized off-road vehicle (ORV) events to pass through these wilderness study areas (WSA) "on existing ways and trails, so long as the BLM has determined that such use satisfied the non-impairment criteria."

As observed by the district court, "[i]t is unquestionable that the 1983 race had an adverse impact on the visual integrity of WSA 242. This adverse impact is a direct consequence of the adoption of Amendment No. 6. The determinative issue is whether this impact is sufficiently egregious to violate the BLM's IMP on non-impairment." The district court found that it was not.

In arriving at its decision, the district court judge reviewed the relevant depositions, reports and other testimony, as well as making his own visual inspection of the site. Over objection by the federal appellees and District 37, the judge included post-race reports and evaluations concerning the impact of the 1983 event in his review. The district court concluded that the BLM's construction of the statute was supported by substantial evidence and was not an abuse of discretion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (more than a mere scintilla).

■ Agency interpretation "is especially weighty where statutory construction involves 'reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation (depends) upon more than ordinary knowledge respecting the matters subjected to agency regulations.'" *State of Washington, Dept. of Ecology v. U.S.E.P.A.,* 752 F.2d 1465, 1469 (9th Cir.1985) (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

The BLM, interpreting "substantially unnoticeable in the area as a whole," determined the term to mean "substantial" in the context of the WSA as a whole—not on a parcel-by-parcel basis. We find that this interpretation is a reasonable one, consistent with our decision of *Sierra Club v. Clark,* 756 F.2d at 690, and the principles of multiple use. 43 U.S.C. § 1781(a)(4) (ORV use to be permitted where appropriate).

C. *Executive Order 11644 and 43 C.F.R. § 8342.1*

Designation of approved routes for ORV use under the Desert Plan must be made in accordance with the ORV route designation criteria set forth in Executive Order 11644 and 43 C.F.R. § 8342.1. Executive Order 11644 was promulgated in 1972 and directs agency heads, including the Secretary, "to develop and issue regulations governing the designation of specific areas and trails on public lands for use by off-road vehicles." *American Motorcyclist Ass'n v. Watt,* 543 F.Supp. 789, 795 (C.D.Cal.1982). The regulations promulgated by the BLM, pursuant to the authority of FLPMA, which set forth the route designation criteria, seek to: (1) minimize conflict among the various users of the public lands; (2) minimize damage to soil, watershed, vegetation, air or other resources (to prevent impairment of wilderness suitability); (3) minimize harassment of wildlife or significant disruption of wildlife habitat; and (4) minimize conflicts between ORV use and other recreational uses. 43 C.F.R. § 8342.1 (1984). FLPMA, 43 U.S.C. § 1781(d), provides that the desert plan must take into account "the principles of multiple use and sustained yield in providing for resource use and development, including, but not limited to, maintenance of environmental quality, rights-of-way, and mineral development."

■ Amendment No. 6 is a proper exercise of the BLM's discretion in providing for combined use of the desert. It seeks to balance desired use and ecological concerns through the imposition of permit and miti-

**1410**

gation requirements. While there is little doubt that negative impacts resulted from the 1983 race, so is there little doubt that harm would result if uncontrolled "protest rides" were to continue. The mitigation requirements seek to assure that impacts are minimized. These requirements are not static—they can be expanded to offer greater assurances of compliance and lessen the potential for harm. The challenged amendment, on the facts of the instant matter, does not seem an abuse of discretion; on the contrary, it seems a reasoned approach to a difficult balancing act mandated by Congress.

### D. Section 302(b) of FLPMA

■ Section 302(b) of FLPMA requires the BLM to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b).

Sierra Club argues that designation of the Barstow to Vegas course has resulted in "severe, and in some cases irreversible damage" which is, therefore, "undue." Sierra also contends that "by no stretch of the imagination" can race course designation be characterized as necessary or appropriate.

This position ignores the fact that "Congress has found that ORV use, damaging as it may be, is to be provided 'where appropriate.'" Sierra Club v. Clark, 756 F.2d at 691; 43 U.S.C. § 1781(a)(4). Sierra Club's proposed interpretation of this regulation would result in the prohibition of ORV use because it is doubtful that any area could withstand such use without degradation. The BLM's decision to permit restricted ORV use, in view of the congressional mandate, is no abuse of discretion. Congress has determined that ORV use is to be provided and the accommodation of that usage, on these facts, is not arbitrary or capricious. Sierra Club v. Clark, 756 F.2d at 691.

### E. National Historic Preservation Act

Section 106 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f, provides that a federal agency "shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, ... take into account the effect of the undertaking on any ... site ... or object that is included in ... the National Register [of Historic Places]." The regulations also provide that "Federal agencies should coordinate NEPA [National Environmental Policy Act] compliance with the separate responsibilities of the [NHPA] ... to ensure that historic and cultural properties are given proper consideration in the preparation of environmental assessments and environmental impact statements." 36 C.F.R. § 800.9 (1984).

■ There is no doubt that the BLM failed to confer with the State Historic Preservation Officer (SHPO) prior to issuance of the permit for the 1983 race. We affirm, however, the district court's conclusion that the fact of actual concurrence by the SHPO in the issuance of the permit, together with imposition of mitigating measures the SHPO requested, satisfied the statutory requirement and its intent.

### F. Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), provides for reversal of agency actions that are "arbitrary, capricious, [or] an abuse of discretion."

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). See also American Tunaboat Ass'n v. Baldrige, 738 F.2d 1013, 1016 (9th Cir.1984); Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1449 (9th Cir.1984).

Sierra Club contends that the BLM's decision violates all four of the above criteria

and so is arbitrary and capricious. We disagree. Our review of the evidence reveals that the BLM, construing its own regulations in light of congressional mandate, gathered a broad range of information, listened to its critics and attempted to address their concerns through imposition of mitigation requirements in the permit process.

### G. Section 102(2)(c) of NEPA: Environmental Impact Statement

 Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(C), requires federal agencies to prepare a detailed statement of the impacts of any proposed "major Federal actions significantly affecting the quality of the human environment." The purpose of this provision is twofold: it provides the decision-maker with sufficiently detailed information to decide whether to proceed on a project in light of potential environmental consequences and it furnishes the public with relevant environmental information. *Adler v. Lewis*, 675 F.2d 1085, 1095–1096 (9th Cir.1982).

Sierra Club contends that the FEIS at issue fails to fulfill either of the *Adler* purposes. The FEIS, they argue, is unintelligible, it fails to adequately explore all alternatives, and lacks a sufficient discussion of appropriate mitigation measures on a site-specific basis.

 By specifically referring to prior BLM studies and supporting materials, the FEIS fulfilled its informational purpose. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 782 (9th Cir.1980). While we acknowledge the magnitude of the information covered in the DEIS and the abbreviated format of the FEIS, we do not agree that the EIS failed to inform the public.

 Nor do we accept Sierra Club's contention that the BLM's rejection of a "no-action" alternative to the EIS violates NEPA. The BLM, in the DEIS, 4–24, 4–25, rejected a no-action alternative on the ground that unmonitored protest rides would continue to occur. Such a decision is subject to a rule of reasonableness. *Adler*, 675 F.2d at 1097. As the district court

observed, the BLM's rationale demonstrates that such an alternative was considered and rejected in favor of controlled access. Additionally, the court noted the substantial number of course changes and other mitigating measures taken which demonstrate that BLM's consideration and adoption of other alternatives, in conjunction with public commentary and concern, was reasonable.

Finally, while we agree that a complete discussion of site-specific mitigation efforts was not incorporated into the FEIS, we note that substantial measures were implemented. These mitigation measures were addressed, albeit briefly, in the impact studies. See FEIS at 4–28; ROD at 2888. The BLM's extensive implementation of mitigation measures on a site-specific basis in response to the public concern demonstrates that the BLM was informed and responsive to the need to minimize adverse impacts on a site-specific basis and implemented measures to assure that this purpose was accomplished.

### CONCLUSION

For the foregoing reasons, the decision of the district court, denying declaratory relief, is

AFFIRMED.